NOT DESIGNATED FOR PUBLICATION

No. 118,496

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BILLY JACK DANIELS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Butler District Court; MICHAEL E. WARD, judge. Opinion filed November 16, 2018.
Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Brett D. Sweeney*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GARDNER, P.J., ATCHESON and POWELL, JJ.


PER CURIAM:  After a bench trial on stipulated facts, the district court found Billy Jack Daniels guilty of possession of methamphetamine and drug paraphernalia. He appeals, contending that the district court erred in not suppressing evidence found in his car. Daniels alleges that his consent to the search of his car was involuntary because he was illegally detained at the time he consented. We find that the officers had reasonable suspicion to legally detain Daniels, that his consent was not rendered involuntary because of an illegal detention, and that the search of his car was legally permissible. Accordingly, we affirm.

*Factual and procedural background*

On March 9, 2017, Officer Mathew Meckel was patrolling the Walmart parking lot in Augusta in his marked patrol car. Around 12:40 a.m., Daniels pulled into the same parking lot. Meckel saw Daniels use his turn signal to make a turn in the parking lot, park his car, and enter the Walmart.

Meckel found Daniels' use of a turn signal odd and went to look at his car. Meckel, using his flashlight, looked into the car's window and saw two pill bottles. One had its prescription label torn off and was in the car's armrest. The other pill bottle, by the driver's seat, looked as though two straws had been inserted into two holes cut into it, and had some type of "mouthpiece" attached to it. He also saw two torch lighters—one in the passenger seat and one in the driver's side door. He believed that the pill bottle with the straws was a "homemade pipe" and noted that the other bottle, with its label torn off, was like the kind sometimes used for storage of illegal drugs. As a result of these suspicions, Meckel called another officer for backup.

Meckel then waited by Daniels' car to "have a consensual encounter [with Daniels] and talk to [h]im." But when Daniels had not returned to his car 40 minutes later, Meckel entered the Walmart to find him. Meckel asked the other officer on the scene to wait by the doors of the building to make sure Daniels did not leave without talking to Meckel.

When Meckel located Daniels, Daniels was holding a torn package with an ink cartridge inside it. Meckel asked Daniels if he was stealing the ink cartridge, and Daniels responded that he was only checking the cartridge to make sure it would fit his printer. Meckel told Daniels that he could have found that information on the packaging itself, without having opened it. Meckel then asked Daniels if he would talk with him about something "suspicious" he had seen in Daniels' car. Daniels replied "okay" and followed

Meckel to the front of the store. This portion of Meckel and Daniels' encounter lasted around 30 seconds.

Meckel led Daniels into a breakroom that doubled as a "loss prevention office." Meckel did not ask Daniels to enter the room but Daniels simply followed him in there. A second officer accompanied them and stood in the room's exit. A third officer stood outside the room. He could be seen from inside the room and the door to that room was left open. Daniels may or may not have known he was there.

After a short conversation in the breakroom, Meckel asked Daniels to submit to a pat down and Daniels agreed. Meckel conducted a pat down but recovered nothing. Meckel then told Daniels he had seen a "funny looking pipe" in Daniels' car. Daniels responded that it was a homemade "vapor pipe," used for smoking tobacco. Meckel asked Daniels if he had anything illegal in his car and Daniels responded that he did not. Meckel then asked if he could search Daniels' car and Daniels agreed. The breakroom encounter lasted roughly two minutes.

Meckel and the other officers then led Daniels to his car to search it. Daniels stood about 10 feet from his car and two officers stood by. Meckel began searching Daniels' car by investigating the altered pill bottle. Meckel smelled the bottle and described it as smelling "fruity." Daniels told the officer, "'[s]ee, I told you, it's a vapor pipe.'" Meckel continued searching and found a blue eyeglass case in the car. That case contained a plastic bag with a white substance in it which tested positive for methamphetamine. The case also contained two Q-tips, a plastic straw, and a glass pipe. Daniels claimed that the case and its contents belonged to someone else.

Daniels was charged with possession of methamphetamine and drug paraphernalia. Before trial, Daniels moved to have the evidence suppressed. After a hearing on that motion, the district court denied it. After a bench trial on stipulated facts,

the district court found Daniels guilty of possessing methamphetamine and drug paraphernalia, and then sentenced him to 20 months in prison. Daniels timely appeals, arguing the court erred in not suppressing the evidence found in his car.

*Did the District Court Err in Denying Daniels' Motion to Suppress?*

Daniels agrees that he consented to the officer's search of his car. But he contends that his consent was involuntary as a matter of law because his consent was the product of an illegal detention.

The State argues that the entire encounter was consensual and never amounted to a detention, so Daniels' consent was valid. In the alternative, the State argues that Daniels was legally detained when he consented to the search of his car because Meckel had reasonable suspicion of criminal activity; thus, Daniels' consent was voluntary.

*Standard of Review*

Generally, an appellate court would review the district court's ruling on a suppression motion to determine whether the district court's factual findings are supported by substantial competent evidence and would review the ultimate legal conclusion drawn from those factual findings de novo. *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016). But when, as here, the parties submit the case to the district court on stipulated facts, appellate courts need determine only the question of law of whether the district court should have suppressed the evidence. This presents an issue subject to unlimited review. *State v. Porting*, 281 Kan. 320, 324, 130 P.3d 1173 (2006).

*Nature of the Encounter*

Section 15 of the Kansas Constitution Bill of Rights "provides protection identical to that provided under the Fourth Amendment to the United States Constitution," *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003), and affords

> "[t]he right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or property to be seized."

Encounters with police generally fall into four categories: voluntary or consensual encounters; investigatory detentions; public safety stops; and arrests. *Cleverly*, 305 Kan. at 605. Voluntary encounters are not considered seizures and do not trigger the protections of the Fourth Amendment. Investigatory stops, on the other hand, require a police officer to "have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime. [Citations omitted]." *State v. Hanke*, 307 Kan. 823, 828, 415 P.3d 966 (2018).

We assume, without deciding, that the encounter between Daniels and the police officers was an investigatory detention at the time Meckel asked for consent to search.

*Voluntariness of Consent*

The State bears the burden of proving the lawfulness of a warrantless seizure. See *State v. Morlock*, 289 Kan. 980, 985, 218 P.3d 801 (2009). The Fourth Amendment requires law enforcement officers who seize an individual or who conduct a search to have either a warrant or a basis for relying on one of the specific and well-recognized exceptions to the warrant requirement. *Riley v. California*, 573 U.S. __, 134 S. Ct. 2473, 2482, 189 L. Ed. 2d 430 (2014); *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081

5

(2014). One exception allows an officer to stop and briefly detain an individual without a warrant when the officer has an articulable and reasonable suspicion, based in fact, that the detained person is committing, has committed, or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985).

Our Supreme Court has recently explained what is required for reasonable suspicion to detain a person:

> "To have reasonable suspicion to detain an individual, '[a] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' *Terry*, 392 U.S. at 21. The suspicion must have '"a particularized and objective basis"' and be something more than 'an unparticularized suspicion or hunch.' *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 [1996], and citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 [1989]). Although the United States Supreme Court has recognized that 'the concept of reasonable suspicion is somewhat abstract,' it has 'deliberately avoided reducing it to "'a neat set of legal rules."'" *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)." *State v. Glover*, 308 Kan. 590, 593-94, 422 P.3d 64 (2018).

This court makes its "'determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances . . . remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence."' [Citations omitted.]" *State v. Moore*, 283 Kan. 344, 354, 154 P.3d 1 (2007).

The State argues that Meckel had reasonable suspicion based on his experience as an officer who had investigated multiple drug crimes, coupled with his observations of items he saw in Daniels' car in plain sight. Daniels argues that the torch lighters and pill

6

bottles were legal and thus innocuous items. We find the State's argument to be persuasive.

We note that the State did not raise the specific issue of reasonable suspicion below so the district court did not address it. But the State maintains that this panel should reach the merits of this argument, invoking a recognized exception to the rule against raising issues for the first time on appeal—that the judgment of the district court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). We agree. The issue of reasonable suspicion is so embedded in the analysis of the district court's decision denying suppression that it requires consideration on the merits.

Whether Meckel had reasonable suspicion of a crime depends heavily on his own testimony. Daniels does not suggest that the district court found Meckel's testimony lacked credibility, thus we accept his uncontradicted testimony as competent evidence. Meckel is a 17-year veteran of the Augusta Department of Public Safety. He testified that he has had training in drug investigations, has conducted many drug investigations, and has seen all sorts of different paraphernalia and different kinds of drugs. When he looked through the window of Daniels' parked car, he saw "two items of immediate concern." One was a pill bottle, orange with a white lid, whose label had been torn off. It was sitting on the armrest between the two front seats. He testified: "I know a lot of times illegal drugs are kept in those. It's a convenient little storage pouch, basically storage container for that."

The second item that immediately concerned him was another orange pill bottle with a white lid, right by the driver's seat where the right leg would be, near the center console. He testified: "[I]t looked like it was designed into some type of pipe, homemade pipe. It had two straws that . . . looked like their holes had been cut into the . . . pill bottle and they'd been inserted. One was a shorter straw, the other one was a longer straw, and

7

attached to that was a mouthpiece. Looked like some sort of mouthpiece attached to it." When asked whether this was just some sort of smoking device, Meckel replied:

"Well, to me I wasn't exactly sure what it was. It looked—At first initial thought it was a marijuana bong of some sort, or some type of illegal drug pipe. Drug pipes can sometimes be pretty inventive and pretty—it's kinda up to the imaginations of the people that are makin' it sometimes. . . . And I've found some very interesting things before. And that's—it looked like some type of illegal drug pipe to me. . . . Aroused my suspicions of that for sure." Meckel then confirmed that his observation of those two items aroused his suspicion that they may be "of an illegal character."

By this testimony, Meckel articulated specific facts which, taken together with rational inferences from those facts, reasonably warranted Daniel's detention. Meckel's suspicion that Daniels had illegal drug paraphernalia in his car was not a mere hunch, but was supported by a particularized and objective basis. As a result, we agree that Meckel had reasonable suspicion to detain Daniels at the time he asked Daniels for consent to search his car.

Daniels suggests that any reasonable suspicion Meckel may have initially had dissipated in the break room when Daniels responded that the bottle Meckel had seen in his car was a homemade "vapor pipe" used for smoking tobacco, then said he had nothing illegal in his car. But Daniels provides no legal authority to support the proposition that an officer must believe or act on a suspect's statements which contradict his own reasonable suspicions. We know of none.

Daniels also suggests that because the pipe was for vaping, which is legal, Meckel's view of the pipe could not have supported a reasonable suspicion of a crime. But Daniels provides no support for his assertion that the pipe was in fact legal. Even had the pill bottles been used solely for smoking tobacco or another legal substance, that fact would not defeat the officer's reasonable suspicion that the bottles were some sort of

8

illegal drug pipes. See *Heien v. North Carolina*, 574 U.S. __, 135 S. Ct. 530, 536, 190 L. Ed. 2d 475 (2014) (holding reasonable suspicion, as required for an investigatory stop, can rest on a reasonable mistake of law). Any mistake by Meckel in thinking that the pill bottles were illegal drug paraphernalia was reasonable.

Meckel's suspicion that Daniels committed, was committing, or would commit a crime was articulable and reasonable. Accordingly, Daniels' detention was proper. While properly detained, Daniels gave Meckel consent to search his car. That consent was valid and voluntarily given. We affirm the district court's decision not to suppress the evidence.